UNITED STATES DISTRICT COURT
EASTERN DISTRICT COURT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICROSOFT CORPORATION, a
Washington corporation,

                Plaintiff,

   -against-

AGA SOLUTIONS, INC., a New York
Corporation, d/b/a/ ADVANCED SOFTWARE
SOLUTIONS and ADVANCED COMPUTER
SOLUTIONS; MITCHELL S. ACKERMAN,
a/k/a/SCOTT SIMON, WANTAMANSION,
and MEGAHERTZ932, an individual; and
LEE K. ACKERMAN, a/k/a/ PASSPORT 2002,
an individual,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF DECISION & ORDER**

O5 CV 5796 (DRH)(MLO)

**APPEARANCES:**

**Yarmuth Wilsdon Calfo PLLC**
Attorneys for Plaintiff
925 Fourth Avenue Suite 2500
Seattle, WA 98104
By:    Scott T. Wilsdon, Esq.
         John Jamnback, Esq.

**Mitchell Ackerman**
Defendant Pro Se
23415 Mirabella Circle South
Boca Raton, FL 33433

**Lee Ackerman**
Defendant Pro Se
c/o Dr. Alan Berman
77 Veterans Memorial Highway
Commack, New York 11725

**HURLEY, Senior District Judge:**

Plaintiff, Microsoft Corporation, ("Plaintiff" or "Microsoft") commenced this lawsuit asserting various causes of action premised on Defendants alleged distribution of counterfeit or unlicensed software and components. Presently before the Court is Plaintiff's motion for partial summary judgment against Defendants Mitchell S. Ackerman ("Mitchell Ackerman") and Lee K. Ackerman ("Lee Ackerman").[1] For the reasons set forth below, the motion is granted in part and denied in part.

*Factual Background*

The following facts are undisputed unless otherwise noted.[2]

**I. Microsoft and its Products**

Microsoft is a Washington corporation that develops, advertises, markets, distributes, and licenses a number of computer software programs.

Microsoft's software programs are recorded on magnetic diskettes and/or CD-ROMs, and they are packaged and distributed together with associated proprietary materials such as user's guides, user's manuals, end user license agreements, and other components. Microsoft incorporates various security features into its software components, including hidden features and features that are difficult to replicate. Additionally, Microsoft distributes Certificates of

---

[1] A default judgment on liability has been entered against the corporate defendant, AGA Solutions Inc.

[2] It should be noted that Plaintiff served Defendants with a Notice to Pro Se Litigants in accordance with Local Rule 56.2. Neither Defendant, however, has filed any opposition to the motion. A default judgment is inappropriate, however, and the Court must examine Microsoft's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109-110 (2d Cir. 2006).

Authenticity and Certificate of Authenticity Labels (sometimes referred to as "COAs," "COA labels" or "COALs"), which are special certificates or labeling components distributed with Microsoft software programs in order to help end-users verify whether they have genuine Microsoft software. COA labels are manufactured with holograms, heat sensitive threads and other security features that make unauthorized duplication difficult. According to Microsoft, it is common for sellers of counterfeit and infringing software to use counterfeit or illicit COA labels in order to deceive consumers into believing they are purchasing genuine Microsoft software. Microsoft's software identification specialists use these security features to determine whether the software is counterfeit or non-counterfeit.

Microsoft has registered a number of trademarks with the United States Patent and Trademark Office, including but not limited to "MICROSOFT," "WINDOWS," "POWERPOINT," and "OUTLOOK", which are used to identify Microsoft computer programs and computer programming services. Microsoft has never consented to Defendants' use of Microsoft's trademarks for counterfeit purposes.

## II. Defendants' Business

The Ackermans operated an Internet-based business through a company website where customers could purchase purported Microsoft software, and through at least three accounts at various times on the eBay Internet auction website. Defendants operated these businesses using, *inter alia*, the name "Advanced Software Solutions." Mitchell Ackerman was president of the incorporated entity, AGA Solutions. He personally participated in the business by buying, selling and advertising the infringing software and related components, and personally received extensive proceeds from the business. Lee Ackerman was vice-president of operations for the

corporation AGA Solutions. She personally took an active role in its management and finances, had check signing authority for the corporation, and received extensive financial draws from the proceeds of the business. The Ackermans were the owners of AGA Solutions and its only full time employees.

The primary outlet for Defendants' sales was through a website registered to Mitchell Ackerman at www.asoftwaresolutions.com. The opening page of this website represented that Defendants sold only "100% Genuine Products." Defendants' website described their business as "New York's fastest growing provider of Software and end-to-end IT Solutions," and included a picture of what purported to be a store with the "Advanced Software Solutions" name. In fact, there was no record of a store by the name "Advanced Software Solutions" in Jericho or the surrounding communities. Surveillance conducted by Microsoft revealed that Defendants were operating the business from their residence in Jericho, New York and were utilizing a private mailbox at a nearby UPS Store.

### III. Infringing Products

Microsoft obtained samples of the software purchased from Defendants and compared them to genuine software samples. The samples purchased from Defendants' business were obtained from four sources: (a) individuals and businesses who contacted Microsoft after purchasing software from Defendants, (b) Microsoft's own investigation and test purchases, (c) the United States Customs Service, and (d) the Nassau County Police (which searched and seized products at Defendants' residence).

**A. Defendants' Customers**

Beginning approximately in May 2002, Microsoft received numerous complaints from

individuals and businesses that contacted Microsoft about software they had allegedly purchased from Defendants. Most customer complaints originated through an on-line validation service that Microsoft provides to the public, which allows customers to verify whether their software is a genuine Microsoft product. Between approximately July 29 and September 28, 2005, Microsoft received and analyzed eighteen (18) samples of Microsoft Windows XP Pro that had been voluntarily submitted to Microsoft by sixteen (16) unrelated individuals located throughout the nation, each of whom contacted Microsoft after purportedly purchasing the software from Defendants. The analyses resulted in the following findings: all 18 CD-ROMs (software) that were submitted to Microsoft were counterfeit; all 10 COA labels that were submitted to Microsoft were counterfeit; and all seven user's manuals that were submitted to Microsoft were counterfeit. On or about October 27, 2005, Microsoft received and analyzed a sample of Microsoft Office 2003 Pro and a sample of Microsoft Windows XP Pro that had been voluntarily submitted by a business in Wisconsin that contacted Microsoft claiming to have purchased the software from Defendants. That analysis resulted in a finding that the CD-ROMs (software), COA labels and user's manuals were counterfeit. Finally, on or about October 21, 2002, Microsoft received and later analyzed a sample of Microsoft Office 2000 Premium that had been voluntarily submitted by an individual in Rhode Island who contacted Microsoft and reported purchasing the software from Defendants. That analysis determined that the CD-ROM (software) was genuine, but had been tampered by the placement of a sticker over the words "Not for Resale" on the disc.

### B. Microsoft's Investigation

As a result of these customer complaints, Microsoft initiated its own investigation led by

Tom Montgomery, Senior Investigator for Microsoft. As the investigation intensified between May and November 2005, multiple software orders were placed by private investigators working at Mr. Montgomery's direction. The orders were made using the on-line ordering feature on Defendants' site.

More specifically, between approximately May 31, 2005 and October 27, 2005, Microsoft received and analyzed samples of Microsoft Windows XP Pro (twice), Microsoft SQL Server 2000 Standard Edition, and Microsoft Office 2003 Pro that separately had been purchased by a private investigator from Defendants' site at www.asoftwaresolutions.com. Microsoft analyzed this software and determined that the CD-ROM (software), COA labels and user's manuals were counterfeit. On or about April 4, 2004, Microsoft received and analyzed a sample of Microsoft Office 2000 Premium that had been purchased by a private investigator from Defendants' website. That analysis determined that the CD-ROM (software) was genuine, but the product key had been tampered. Finally, six separate test purchases conducted by Microsoft between September 11, 2002 and October 11, 2005 also established that Defendants were also selling genuine Microsoft software that was not for resale or that Defendants were not licensed or authorized to sell, such as software provided pursuant to academic or volume licensing agreements. In his deposition, Mitchell Ackerman admitted that he sold volume license product. He likewise acknowledged receiving by email, on at least one occasion, as far back as July 2005, a complaint from a customer (Peter Lahaye of Maine) who accused Mr. Ackerman of selling tampered and counterfeit software.

### C. The Customs Service Seizure

On or about July 14, 2005, agents of the United States Customs Service ("Customs

Service") seized a shipment of 50 units of Microsoft Windows XP Professional that had entered the country from China. "Scott Simon" was listed as the importer. "Scott Simon" is an alias used by Mitchell Ackerman. Mitchell Ackerman has acknowledged that some of the software seized on July 14, 2005 was purchased from China. He further acknowledged several trips he made to China for the purpose of purchasing purported Microsoft software.

On or about October 6, 2005, Microsoft was requested by the Customs Service to analyze a sample unit of Windows XP Pro that had been seized on or about July 14, 2005, to determine whether the software was a genuine Microsoft product. The resulting laboratory analysis of this sample unit determined that the CD-ROM (software), COA label and user's manual were counterfeit.

**D. The Search Warrant Seizure**

In the fall of 2005, New York State law enforcement authorities obtained a search warrant from a New York state court and, on or about November 7, 2005, executed that warrant at the Ackermans' residence in Jericho, New York. At the request of the Nassau County District Attorney, two Microsoft employees, Ms. Krumm and Ms. Bankhead, participated in the search. Ms. Krumm assisted in cataloging counterfeit and infringing Microsoft products. Ms. Krumm catalogued a total of 2,569 units of counterfeit and infringing Microsoft products that were identified during the search at Defendants' residence.[3] These items were seized and removed by

---

[3] Specifically, the items seized included 1915 units of counterfeit software and/or components , 218 units of tampered software and/or components, and 436 units of mislicensed or infringing software and/or components involving the following products: Business Content Manager, Exchange Server 2003 enterprise, FrontPage 2003, Office 2000 Premium & Professional, Office Professional 2003, Office 2003 Professional Enterprise Edition, Office 2003 Standard, Office 2004 for Mac Professional, Office 2004 for Mac Standard, Office 97 Professional, Office XP Professional, Office XP Professional with FrontPage, Office XP

the District Attorney and law enforcement personnel. Ms. Krumm estimates that, independent of the product keys,[4] the counterfeit and infringing Microsoft products seized from Defendants had an estimated retail price of $1,078,722. According to Microsoft, this volume and value of contraband and Defendants' use of the Internet to facilitate their sales are consistent with a large scale counterfeit operation. On the same day of the seizure, November 7, 2005, Mitchell Ackerman was arrested by agents of the Nassau County District Attorney and was charged with two felony counts, including one count of possession of stolen property and one count of trademark counterfeiting, in violation of New York State Penal Law. He was released shortly after his arrest and pled to a misdemeanor.

Microsoft's analysis of the seized items determined that approximately 90% of the seized software included counterfeit, tampered, and/or infringing versions of nineteen (19) of Microsoft's most popular products covered by Microsoft's registered copyrights and bearing Microsoft's registered trademarks or imitations thereof. Additionally, Microsoft's analysis of the seized items identified product tampering involving at least four Microsoft software products. According to Microsoft, the volume of the counterfeit and infringing software, COA labels, and product keys seized at the raid, as well as the past actions of Defendants, among other things, demonstrate that Defendants intended to traffic the counterfeit and infringing software and

---

Standard, One Note 2003, Project 2002, Project 2003, Publisher 2002, SQL Server 2000 Enterprise Edition, Visio 2003 Professional, Visual Studio NET Enterprise Architect 2003, Windows 2000 Advanced Server, Windows 2000 Professional, Windows 2000 Server 10 Client, Windows 2003 Server Standard, Windows 98 Second Edition, Windows NT Workstation 4.0, Windows XP-Home, Windows XP-Professional, and Windows XP Professional x64 Edition.

[4] Certain Microsoft software requires a special Product Key that must be entered for the software to work. Product Keys are 25-character alphanumeric codes generated by Microsoft; each key is unique to the licensee to whom it is distributed.

related documentation.

## *Discussion*

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See*

9

*Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings. *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e). More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

**II. Copyright Infringement**

To establish a claim of copyright infringement, a plaintiff must demonstrate that (1) it is a valid owner of a copyright and (2) the defendant has engaged in unauthorized "copying." *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985). "[C]opying is shorthand for the infringing of any of the copyright owner's five exclusive rights, described at 17 U.S.C. § 106." *Microsoft Corp. v. Harmony Comp. & Elecs., Inc.*, 846 F. Supp. 208, 210 (E.D.N.Y.1994) (citing *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1085 n.5 (9th Cir. 1989)). These exclusive

rights include the right to reproduce and to distribute. *See* 17 U.S.C. § 106. Intent or knowledge is not an element of infringement. *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1113 (2d Cir. 1986); *see also Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995) (stating that "'innocent infringement,' or copying from a third source wrongfully copied from the plaintiff, without knowledge that the third source was infringing, does not absolve a defendant of liability for copyright infringement").

It is undisputed that Microsoft owns the copyrights for the following software: Microsoft Windows XP Professional; Microsoft Windows 2000 Professional; Microsoft Office 2003 Professional (which includes Microsoft Access, Excel, Outlook, PowerPoint, Word and Publisher 2003); Microsoft Office XP (which includes Microsoft Access, Excel, Outlook, PowerPoint, Word and FrontPage 2002); Microsoft Office 2000 (which includes Microsoft Access, Excel, Outlook, PowerPoint, Word and Publisher 2000); Microsoft Money 2004; Microsoft Windows 2003 Server; Microsoft Exchange Server 2003; Microsoft Project Server 2003; Microsoft Office Project Professional 2003; Microsoft Visio 2003; Microsoft FrontPage 2003; Microsoft SQL Server 2000; Microsoft Windows 2000 Server; Microsoft Windows 98; and Microsoft Office 97. Thus, the first prong of the test for copyright infringement has been met.

Turning to the second prong, there is undisputed evidence that Mitchell and Lee Ackerman distributed counterfeit copies of Microsoft copyrighted software, including, but not limited, to Windows XP Pro and Office 2003 Pro thereby violating Microsoft's exclusive right of distribution. The evidence is undisputed that both these Defendants personally participated in and/or had the right and ability to supervise, direct and control the infringing conduct and

11

benefitted from it. They are therefore jointly and severally liable. *See Sygma Photo News Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985) ("All persons and corporations who participate in, exercise control over or benefit from the infringement are jointly and severally liable as copyright infringers.").

Microsoft is entitled to summary judgment against Mitchell and Lee Ackerman on liability on the copyright infringement claim.

### III. Trademark Infringement

To establish a claim of trademark infringement under section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), a plaintiff must produce evidence that the defendant "(1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services and (4) that such a use is likely to cause confusion." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993).

It is undisputed that Microsoft has registered a number of trademarks including, but not limited to, "Microsoft," "Windows," "Powerpoint," and "Outlook" which are used to identify Microsoft computer programs and programming services. It is further undisputed that Microsoft has never consented to Defendants' use of its trademarks for counterfeit purposes.

Moreover, based on the uncontradicted evidence, Defendants used Microsoft's trademarks in commerce to sell software, without consent, that were counterfeit reproductions of Microsoft's registered marks. Said use was likely to cause confusion because "counterfeits, by their very nature cause confusion." *Gucci America, Inc. v. Duty Free Apparel Ltd,* 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). Having participated in the infringement, the Ackermans are

jointly and severally liable therefor. *See, e.g., David Berg & Co. v. Gatto Int'l Trading Co.*, 884 F.2d 306, 311 (7th Cir. 1989).

Microsoft is entitled to summary judgment against Mitchell and Lee Ackerman on the claim for trademark infringement.

## IV. False Designation of Origin or Approval

Claims of false designation of origin or approval are governed by section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1). Section 43(a)(1) provides in relevant part:

> Any person who, on or in connection with any goods or services or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

To establish a claim of false designation of origin, a plaintiff must establish that "it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 137 (2d Cir. 1999) (internal quotations and citations omitted); *see also Time Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir. 1999). Because the elements of a claim under 15 U.S.C. § 1114 are virtually the same as under 15 U.S.C. § 1125(a), case law applicable to section 32 claims applies to section 43 claims. *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114

(2d Cir. 2006).[5]

The same facts that establish that the Ackermans violated section 32 of the Lanham Act establish that they violated section 43(a) by falsely designating the origin of the software they sold. *See generally Century 21 Real Estate LLC v. Raritan Bay Realty, Ltd.*, 2008 WL 4190955 (E.D.N.Y. Sept. 3, 2008). It is undisputed that the counterfeit software sold by the Ackermans was packaged and designed so to appear to the consumer to be genuine Microsoft products.

Microsoft is entitled to summary judgment on its claim pursuant to section 43(a) of the Lanham Act.

**V. Anti-Counterfeiting Act Claims**

18 U.S.C. § 2318 prohibits trafficking in counterfeit labels, documentation and/or packaging. Although a criminal statute, it provides for a civil remedy for any copyright owner who is thereby injured or threatened with injury. The statute provides in relevant part:

> (a) (1)  Whoever, in any of the circumstances described in subsection (c), knowingly traffics in –
> (A) a counterfeit label or illicit label affixed to, enclosing or accompanying, or designed to be affixed to, enclose or accompany ... a copy of a computer program . . .  or (B) counterfeit documentation or packaging, shall be fined under this title or imprisoned . . . .
> . . .
> (e)  Any copyright owner who is injured, or is threatened with injury, by a violation of subsection (a) may bring a civil action in an appropriate United States district court.

18 U.S.C. § 2318.

Here, it is undisputed that the Ackermans repeatedly distributed counterfeit COA labels

---

[5] Section 43(a) of the Lanham Act is broader than section 32 in that the former covers both registered and unregistered trademarks.

and Microsoft user's manuals. The statute, however, requires that prohibited conduct be done "knowingly." "[A] defendant acts knowingly when he acts intentionally and voluntarily. Knowledge is established, however, if a person is aware of a high probability of its existence, unless he actually believes that the fact does not exist. A defendant does not act knowingly however, if he acts out of ignorance, mistake, accident, or carelessness." *United States v. Doyle*, 130 F.3d 523, 540 (2d Cir. 1997). *See also United States v. Hastings*, 918 F.2d 369, 372 (2d Cir. 1990).

Microsoft argues that "Defendants knowingly trafficked in counterfeit or illicit labels as they have acknowledged ,on at least one occasion as far back as July 2005, receiving by email a complaint from a customer in Maine who accused Mr. Ackerman of selling tampered and counterfeit software." (Microsoft's Statement of Material Facts and Mem. in Support at 19.) Based on the facts and arguments advanced, the Court cannot conclude that there is no material issue of fact as to whether these Defendants acted knowingly. First, despite Microsoft's statement that both Defendants acknowledge receipt of the email, no evidence has been presented as to Lee Ackerman's knowledge of the accusatory email. Second, Microsoft does not cite any support for the proposition that one accusation of selling tampered and counterfeit software establishes that the seller acted knowingly.

Summary judgment is denied on the Anti-Counterfeiting Act claims. [6]

## VI. Permanent Injunctive Relief

In its motion, Microsoft seeks permanent injunctive relief against any future violation of

---

[6] Because Microsoft can only recover once, it is unclear to the Court why Microsoft would continue to press a claim under the Anti-Counterfeiting Act which injects the concept of knowingly onto Microsoft's burden of proof.

Microsoft's copyrights and trademarks.

Both the Copyright Act and the Lanham Act provide for injunctive relief. 17 U.S.C. § 502(a); 15 U.S.C. §§ 1116(a) and 1125(c)(2). A court may grant such relief if a plaintiff satisfies the following four factors: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). An injunction does not automatically follow a determination that a copyright or trademark has been infringed. *See id.* at 392.

Given that it appears the last act of infringement occurred in November 2005, coupled with the fact that Microsoft does not address the four factors in its papers, the motion for a permanent injunction is denied without prejudice.

### *Conclusion*

Microsoft's motion for summary judgment is granted as to liability on its claims for copyright infringement, trademark infringement and false designation of origin or approval but is otherwise denied.

**SO ORDERED.**

Dated: Central Islip, New York
November 21, 2008

/s/
Denis R. Hurley
Senior District Judge